**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| YOLANDA H. PARKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18 C 2806 |
| | ) | |
| CHICAGO TRANSIT AUTHORITY, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In the wake of her daughter's suicide, Plaintiff Yolanda Parker developed post-traumatic stress disorder ("PTSD"), major depressive disorder, parasomnia, severe anxiety, and high blood pressure. Over time, these conditions began to interfere with her ability to continue working as a bus operator for Defendant Chicago Transit Authority ("CTA"). Ms. Parker took extended periods of medical leave in 2014 and 2015 under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* When Ms. Parker returned to work at CTA, she faced treatment that she claims was unlawful. In particular, Ms. Parker argues she was denied accommodations for her disabilities, was the subject of derogatory comments from coworkers, and was deprived of opportunities to serve in supervisory roles. In this lawsuit, Ms. Parker alleges that Defendant CTA violated her rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(b), by creating a hostile work environment, failing to provide reasonable accommodations, and discriminating against her based on her disabilities. She also claims that CTA retaliated against her for using FMLA leave. CTA moved for summary judgment on all counts. For the reasons set forth below, Defendant's motion for summary judgment is granted in part and denied in part.

**BACKGROUND**

**A.    Yolanda Parker's Employment and Leave**

Plaintiff Yolanda Parker began working for Defendant CTA in 1999 as a part-time bus operator. (Def.'s 56.1 Statement of Undisputed Facts [118] (hereinafter "Def.'s 56.1"), ¶ 4.) CTA

1

promoted her to a full-time bus operator position in 2001.  (*Id.* ¶ 5.)  She held that position until September 26, 2016 when she was promoted to her current position of bus services supervisor. (Parker Dep., Ex. E to Def.'s 56.1 [118-2] (hereinafter "Parker Dep."), at 14:2–7; 16:19–24.)

On March 12, 2013, Ms. Parker came home to find her daughter hanging by the neck in her garage, having committed suicide.  (Pl.'s Statement of Additional Facts, Ex. 1 to Pl.'s 56.1 [125-1] (hereinafter "Pl.'s SOAF") ¶ 1.)  This tragic event resulted, the following week, in a diagnosis of PTSD, major depressive disorder, parasomnia, severe anxiety, and high blood pressure.  (Def.'s 56.1 ¶ 36.)  Ms. Parker's mental and physical conditions rendered her unable to work.  (*Id.*)

When a CTA employee misses work due to illness, that absence is characterized as either a "sick book entry" or as leave under the FMLA.  (Def.'s 56.1 ¶ 30.)  CTA asserts that it does not discipline employees for taking FMLA leave.  (*Id.*)  According to testimony from CTA bus operator, Mandy Jamison, absence for a sick book entry may be excused or unexcused.  (Jamison Dep., Ex. K to Def.'s 56.1 (hereinafter "Jamison Dep."), at 49:10–19; 55:22–56:13.)  To get an excused absence, CTA requires the employee to file a claim, signed by their doctor, with CTA's third-party claims management service, Sedgwick CMS ("Sedgwick").  (*Id.*)  Unexcused sick book entries result in progressively stricter punishments; the first will result in a verbal warning, the second a written warning, and the third a suspension.  (*Id.* at 54:7–55:5.)  An employee who has six unexcused sick book entries can be terminated.  (*Id.* at 55:3–5.)  Sick book entries can also affect an employee's eligibility for promotion.  (*Id.* at 55:10–13.)

A CTA employee who needs extended leave is placed in a status referred to as "Area 605"—that is, a status for employees unable to perform essential functions of their work due to a temporary medical disability.  (Def.'s 56.1 ¶ 13.)  An individual in Area 605 remains away from work but is still considered a CTA employee.  (*Id.*)

After taking time off in May 2013, Ms. Parker was charged with a sick book entry and received a suspension.  (Parker Dep. at 74:22–76:6.)  From January 8, 2014 to January 7, 2015,

Ms. Parker was approved for and granted 472 hours of FMLA leave. (Def.'s 56.1 ¶ 37.) On January 7, 2015, Ms. Parker requested additional FMLA leave for asthma. (Id. ¶ 39.) CTA denied this request, as Ms. Parker was eligible for only 8 more hours of FMLA leave. (Id.) Between January 29 and August 4, 2015, CTA placed Ms. Parker on approved long-term leave in Area 605. (Id. ¶ 37.)

**B.     Parker's Return to Work**

An employee in Area 605 who wishes to return to work must provide CTA with medical documentation of her ability to do so. (Id. ¶ 23.) On July 28, 2015, Ms. Parker obtained such documentation from Dr. Munira Patel ("Dr. Patel"), who reported that Ms. Parker continued to experience "intractable anxiety and depression in accordance with her diagnosis of PTSD," and that Ms. Parker was pregnant—a fact Ms. Parker, herself, had learned just days earlier. (Id. ¶¶ 57, 61.) Ms. Parker's disabilities "prohibited her from performing her job as a bus operator." (Id. ¶ 61.) Dr. Patel reported that Ms. Parker could, however, return to work with the accommodation of no bus driving. (Id. ¶ 62.) The medical documentation indicated that she also could not work more than eight hours per day. (Id.)

There is conflicting testimony as to how long Ms. Parker would need this requested accommodation to last. In its 56.1 statement, CTA asserts that Dr. Patel requested the accommodation only until August 3, 2015, but there is no support in the record for this statement.[1] (Id.) Ms. Parker asserts that she "submitted documentation requesting an accommodation of no bus driving until September 30, but that was rejected by Maddox." (Pl.'s Resp. to Def.'s 56.1 [125] ¶ 62.) Georgette Hampton, chairperson of CTA's Accommodation Review Committee, confirmed that Ms. Parker's medical documentation showed she needed accommodations of no bus driving and working no more than eight hours per day from August 1 through September 30, 2015. (Pl.'s

---

[1]     CTA's 56.1 statement cites to the following sources for this proposition: Ex. EE, Dr. Munira Patel Dep. 44:4–24; Ex. FF, July 28, 2015 Medical Documents at 2, 4. The cited lines of Dr. Patel's Deposition do not indicate any date of return, and Exhibit FF, presumably the underlying medical documentation, does not appear in the record at all.

SOAF ¶ 24 (citing Hampton Dep., Ex. A to Pl.'s Opp'n [124-1] (hereinafter "Hampton Dep."), at 49:4–50:11; 55:7–23).)

CTA typically channels requests for accommodations to its Accommodation Review Committee ("ARC") for a final determination. (*See* CTA Administrative Procedure # 1017, Ex. O to Def.'s 56.1 (hereinafter "AP 1017") at 1, 5.) Generally, when a manager receives a request for an accommodation—or becomes aware that an employee may need an accommodation—CTA policy requires that manager promptly to direct that employee to the ARC. (*Id.* at 8.) CTA tells employees returning to work from Area 605 that they can direct requests for reasonable accommodation to Deshone Maddox ("Maddox"), CTA's Leave Management Coordinator. (Hampton Dep. at 33:18–34:10.)

Ms. Parker did just that. She contacted Maddox, asked for the accommodations of no bus driving and no shifts longer than eight hours, and provided Dr. Patel's medical documentation in support of these requests. (Def.'s 56.1 ¶¶ 61–62.) In the past, CTA had made similar accommodations by temporarily reassigning bus drivers to janitorial work or administrative work. (Hampton Dep. at 32:16–33:15.) CTA had also given "light duty" assignments to pregnant individuals and individuals injured on the job. (*Id.* at 63:17–64:13.) CTA's policies, however, limit the availability of such accommodations: specifically, CTA can provide a worker with a "light duty" assignment only if there is a vacancy in the relevant department at the time the employee requests an accommodation. (Maddox Dep., Ex. B to Def.'s 56.1 (hereinafter "Maddox Dep."), at 28:12–23.) As Maddox testified, "if an employee has skill sets to be a janitor, if there is currently no janitor positions available, they can't be placed into that position." (*Id.* at 20–23.) Neither Ms. Parker nor CTA has offered evidence on whether any janitor positions—or other such positions that fit Ms. Parker's needs—were available when Ms. Parker requested her accommodations.

In this case, when Ms. Parker asked Maddox for accommodations, Maddox simply said no. (Parker Decl., Ex. 14 to Pl.'s Opp'n [124-14] (hereinafter "Parker Decl."), ¶ 17.) Ms. Parker contends that Maddox told her she could return to work only if she came back to full duty with no

restrictions. (*Id.*) Maddox did not say anything about the Accommodation Review Committee, nor did she provide Ms. Parker with alternative methods for requesting an accommodation. (*Id.* ¶ 18.) Ms. Parker had received an accommodation from CTA years earlier, in 2002, when she had broken her jaw while driving a bus—she had been assigned to a "training and instruction" position until she healed. (Parker Dep. Additional Pages, Ex. A to Def.'s Resp. to Pl.'s SOAF [131-2] (hereinafter "Parker Dep. Additional Pages"), at 153:22–154:13.) Parker testified that when she requested accommodations in 2015, however, Maddox told her that in order to be entitled to an accommodation, Parker "had to be injured on duty, not sick." (*Id.* at 154:2–13.) Maddox herself confirmed that "light duty . . is restricted to injured, on-duty folks" and that the process for seeking an accommodation for a disability differs from the process for seeking a "light duty" assignment. (Maddox Dep. at 26:6-8; 30:10-31:9) Hampton expanded the category of persons who could request light duty; she testified that a bus operator injured on duty or one seeking a pregnancy-related accommodate is eligible for a "light duty" assignment. (Hampton Dep. at 63:17–64:10; *see also* Maddox Dep. at 25:20–26:10.) CTA's policies do, however, allow accommodations for individuals who have medical restrictions but were not injured on the job. (*See* AP 1017; CTA Administrative Procedure # 1011, Ex. N to Def.'s 56.1; *see also* Maddox Dep. at 31:1–9.)

Faced with rejection of her request for accommodation, Ms. Parker returned to her doctor, asking Dr. Patel to change the medical documentation and state instead that Ms. Parker was capable of returning to work with no restrictions. (Parker Decl. ¶ 21–22.) Ms. Parker explained that she "had no other option." (Parker Dep. at 168:8–19.) "Due to being out of work" she "could not pay [her] mortgage . . . had to file bankruptcy . . . [and t]he reality was, if [she] did not go back to work, [she] would be homeless." (Parker Decl. ¶ 20.) Dr. Patel wrote up new medical documentation for Ms. Parker. This new documentation—issued just one week after the original medical documentation—continued to describe Ms. Parker's PTSD and pregnancy but nevertheless approved Ms. Parker's return to work with no restrictions. On August 4, 2015, Ms.

Parker presented the new documentation to Maddox. (Parker Decl. ¶ 23; Def.'s 56.1 ¶¶ 61–63.) Six days later, on August 12, 2015, Ms. Parker returned to full duty as a bus driver. (Parker Decl. ¶ 25.)

Shortly after returning to work, Ms. Parker began bleeding heavily while driving the bus. Soon after, she lost her unborn child. (Parker SOAF ¶ 4.) When asked in her deposition if her physicians told her that CTA was the cause of her miscarriage, Ms. Parker testified, "No. They said all of this stress, it put a lot of pressure on your pregnancy. It's hard to keep a pregnancy viable" amidst all of the various sources of stress coming from her job at the CTA. (Parker Dep. Additional Pages at 172: 9–24.) Elsewhere, Ms. Parker testified that she believes her miscarriage occurred because of "CTA's failure, CTA's harassment, CTA's falsification [among other stresses at her job]." (*Id.* at 155:3–14.) She explained, "That's why I didn't want to come back to the bus. I would have picked up trash off the floor, anything. They gave me nothing and told me I had to drive the bus." (*Id.*) Dr. Shawn Davies testified that, while the "most common reason for miscarriage would be genetic anomaly," Ms. Parker "did not have testing done on the pregnancy," so "the etiology is unknown." (Dr. Shawn Davies Dep., Ex. B to Def.'s Resp. to Pl.'s SOAF (hereinafter "Davies Dep."), at 14:13–20.)

## C. Workplace Comments about Ms. Parker

Ms. Parker claims that, throughout 2015, various bus operators and managers made derogatory comments about her in the workplace. She testified that, while she was in Area 605, several bus operators called her "crazy" behind her back on multiple occasions. (Def.'s 56.1 ¶ 64.) Parker acknowledged that she did not hear these comments herself and could not identify who made these comments behind her back. (*Id.*; Parker Dep. at 142:17–18 ("They would never say it directly to my face. They would tell other people and they would tell me.").) She did, however, identify a few instances in which coworkers made derogatory comments to her face. First, Ms. Parker testified that her manager, James Lachowicz, accused her of "falsifying [her] illness" when she returned from medical leave. (Parker Decl. ¶ 25.) Second, Ms. Parker testified

that a couple of coworkers made derogatory comments about her daughter's death.  In particular, she testified as follows:

> [S]ome people would say your daughter is going to hell; she can't go to heaven because she killed herself.  Christopher Genius, like he said, you don't even have a daughter, as if I was just fucking crazy. I'm like, what? Well, what I meant to say, to solidify what I meant, your daughter is technically dead, so you don't have a daughter, do you.  And they would laugh and joke and make it just—like it was just a circus.

(Parker Dep. at 140:13–141:2.)  Ms. Parker did not provide the dates or times of these incidents. She later clarified that the comments about her daughter "going to hell" arose on just one occasion.  (*Id.* at 142:8–11.)  Ms. Parker also testified that there were "vicious rumors" going around about her, such as that she faked her granddaughter's death to get deferred compensation; this despite the fact that it was her *daughter* who died and that Ms. Parker was not eligible for deferred compensation.  (*Id.* at 141:8–13.)  Ms. Parker did not identify the individuals who made these comments, nor did she report any of these comments to CTA management.  (*Id.* at 141:14–17.)  Finally, Ms. Parker testified that her friend, Tracy Robinson, told her that managers Ronnie Brown, Randolph Williams, and Jairo Naranjo were making comments about Ms. Parker when she was not around.  (*Id.* at 142:12–143:9.)  Ms. Parker could not identify a timeframe of when those comments were made.  (*Id.* at 143:6–9.)

## D.    The Supervisory Pool

In addition to her allegations of failure to accommodate and a hostile work environment, Ms. Parker alleges she was denied promotions to which she was entitled.  As noted, she began her work for CTA in 1999 as a part-time bus operator.  Several years later, on July 12, 2012, she was promoted to the "supervisory pool"—a program designed to train bus operators to take on the tasks of a supervisor so they can fill in as substitutes when permanent supervisors are unavailable.  (Def.'s 56.1 ¶ 6.)  Members of the pool continue to serve as bus operators when they are not needed as substitute supervisors.  (*Id.*)  Once placed in the pool, a bus operator

remains there as a substitute supervisor but is eligible for promotion to a full-time position when one becomes available.  (*Id.* ¶ 8.)

Each time there is an opening, management decides which member of the pool to use as a substitute supervisor.  (Jamison Dep. at 15:13–21.)  Ms. Parker testified that her managers made comments suggesting that they refused to select her as a substitute supervisor to punish her for taking FMLA leave.  One manager told her "if you can't come to work and drive a bus you can't come to work and be in the supervisor pool."  (Parker Decl. ¶ 30.)  Another "said there she is right there.  She know.  She used FMLA.  That's why."  Ms. Parker said she assumed this was a reference to the fact that she was not being used in the supervisory pool.  (Parker Dep. at 147:2–17.)  Asked whether she had sought an explanation of this comment, she responded, "Why would I?  You don't challenge management.  You're not even supposed to say nothing to them."  (*Id.* at 147:18–21.)  Indeed, Parker confirmed that it is "almost common knowledge . . . that people that took FMLA leave would not be utilized in the supervisor pool."  (*Id.* at 109:12–16.)  Ms. Parker did not identify the date or time that either of these conversations occurred.  Tracy Robertson, another bus operator in the supervisory pool (Def.'s 56.1 ¶ 9), testified to the following:

> Q:     So if an employee in the supervisory pool were to take FMLA leave, would that affect their ability to be utilized as a supervisor?
>
> A:     Yes. If [management] finds out, yes.
>
> Q:     And what do you mean by that?
>
> A:     Meaning the transportation manager that's at the garage, if they informed [management] that you're FMLA'ing, that's when they going to decide, well, we not going to put her out, we not going to use her, because she's FMLA'ing on the bus . . . .

(Robertson Dep., Ex. M to Def.'s 56.1 (hereinafter "Robertson Dep."), at 25:13–24.)

Ms. Parker testified that there were many occasions on which she could have been used as a substitute supervisor but was overlooked for individuals in the pool who had less seniority than she did.  (Parker Decl. ¶ 31.)  As she herself acknowledged, however, CTA managers do not choose substitute supervisors from the pool on the basis of seniority.  (Jamison Dep. at 16:12–

20, 62:20–23; Robertson Dep. at 22:17–23:13; Parker Dep. at 101:22–102:5.)  Ms. Parker did not

provide dates or times of the instances in which she was overlooked as a substitute supervisor,

so the court is uncertain whether she was, in fact, on the job on those dates.  Tracy Robertson

testified that "[w]hen [Ms. Parker] came to work, she was used in the pool" as much "as others

when they came to work."  (Robertson Dep. at 40:4–21.)  But, Robertson testified, "Yolanda was

never really a person that always comes to work.  You have to come to work for CTA.  They not

going to use you for nothing."  (*Id.* at 40:10–13.)

Bus operators typically remain in the supervisory pool for about five years before getting

promoted to a full-time supervisor position.  (Def.'s 56.1 ¶ 8.)  Ms. Parker herself was promoted

to her position as bus services supervisor on September 26, 2016, just over four years after she

first entered the pool.  (*Id.* ¶¶ 4, 6.)

E.    **Procedural History**

On January 6, 2015, Ms. Parker filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC") alleging that she was the victim of discrimination

on the basis of her disability and that she has suffered retaliation for having engaged in protected

activity.  (Compl. [1] at 9.)  The EEOC sent Ms. Parker a notice of right to sue on January 23,

2018.  (Compl. at 3.)  On April 19, 2018, Ms. Parker filed a *pro se* complaint against Defendants

CTA and Sedgwick—a company that provides benefits management services for CTA.  (Compl.

at 1.)  Now represented by counsel and after several rounds of amendments, on December 10,

2018, Ms. Parker filed a third amended complaint [70] alleging (1) disparate treatment under the

ADA, 42 U.S.C. § 12112(b)(1);  (2) failure to accommodate under the ADA, 42 U.S.C.

§ 12112(b)(5)(A);  (3) unlawful interference under the FMLA;  (4) unlawful retaliation under the

FMLA, 29 U.S.C. § 2601 *et seq.*;  (5) negligent misrepresentation by Sedgwick;  and (6) negligent

misrepresentation by CTA.  (Third Am. Compl. ¶¶ 76–114.)  Ms. Parker also alleged that CTA

created a hostile work environment.  (Third Am. Compl. ¶¶ 52, 79–80.)  The court dismissed all

claims against Sedgwick [81, 89] as well as Ms. Parker's claim for negligent misrepresentation against CTA [104].

On November 6, 2019, CTA moved for summary judgment on all remaining counts [114]. Along with her response to CTA's motion, Ms. Parker filed both a Statement of Additional Facts pursuant to Local Rule 56.1 [125-1] and additional testimony in the form of a declaration [124-14]. CTA's reply brief challenged the admissibility of large portions of both the Statement of Additional Facts and the Parker declaration. (Def.'s Reply [130] at 3–6.) Both sides subsequently filed sur-replies [136,137], addressing CTA's motions to strike portions of these two documents, and the matter is fully briefed.

## ANALYSIS

### A.  CTA's Motions to Strike

Arguing that Plaintiff's summary judgment documents violate Federal Rule of Civil Procedure 56 and Local Rule 56.1, CTA asks the court to strike large portions of (1) the Parker Declaration, and (2) Ms. Parker's Statement of Additional Facts filed pursuant to Local Rule 56.1(b)(3)(C). (Def.'s Reply at 3–6.)

#### 1.  Parker Declaration

First, CTA argues that Ms. Parker's declaration should be stricken as failing to comply with the requirements of Local Rule 56.1. Under Local Rule 56.1, a non-moving party facing a motion for summary judgment, "shall serve and file . . . a concise response to the movant's statement . . . consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment." L.R. 56.1(b)(3)(C). Unless the court allows otherwise, that statement shall not contain "more than 40 separately-numbered statements of fact." *Id.* The Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment." *Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 711 (7th Cir. 2015) (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000)). Still, the Seventh Circuit has been equally clear that "'[i]t

does not follow . . . that district courts cannot exercise their discretion in a more lenient direction.'" *Howard v. Inland SBA Mgmt. Corp.*, 32 F. Supp. 3d 941, 949 (N.D. Ill. 2014) (quoting *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013)).

Here, as required by Local Rule 56.1(b)(3)(C), Ms. Parker has filed a 40-paragraph Statement of Additional Facts. Paragraph 40 of that statement, however, adopts a supplemental declaration, itself another 44 paragraphs long. CTA has moved to strike that declaration as a violation of the Court's Local Rule. The practice of incorporating additional factual statements via a declaration is not supported by either the Local Rule or its interest in promoting concision. *Bank of N.Y. Mellon v. Holmes*, No. 14-cv-04440, 2018 WL 1586240, at *3 (N.D. Ill. Apr. 2, 2018) ("[T]o allow [a litigant] to generally incorporate all the facts from entire documents would defeat the purpose of Local Rule 56.1 [and compromise] . . . [t]he judicial economy promoted by Local Rule 56.1 . . . ."). But much of the declaration appears to be an effort to bolster Ms. Parker's version of the events set forth in her Statement. CTA also argues that the declaration is inconsistent with Ms. Parker's deposition testimony, but in paragraphs 35 and 37—the two paragraphs of the declaration that CTA specifically cites—the court sees no significant inconsistency. CTA asserts that these paragraphs conflict with Ms. Parker's testimony that she was "aware of CTA's policy regarding accommodation requests" and "had a reasonable accommodation before [in 2002]." (Parker Dep. Additional Pages at 153:22–154:4.) In the court's view, that testimony is not inconsistent with statements in the declaration that Ms. Parker (1) did not receive a welcome packet in 2015, (2) was never offered a Transitional Return to Work ("TRTW") opportunity, (3) never received any documentation for obtaining a reasonable accommodation until June 2017, and (4) was not directed to submit documentation to the Accommodation Review Committee when she sought to return to work in 2015. To the extent there is evidence in the record that supports her statements, and the material in her declaration is otherwise admissible, the court will consider them. The motion to strike is denied.

### 2.    Ms. Parker's Statement of Additional Facts

"To defeat a summary judgment motion . . . a party may rely only on admissible evidence." *Lewis v. CITGO Petrol. Corp.*, 561 F.3d 698, 704 (7th Cir. 2009) (collecting cases).  For example, "[a] party may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (collecting cases).  Nor may a party defeat summary judgment by presenting factual statements that are conclusory or amount to mere speculation.  *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 726 (7th Cir. 2004) ("We repeatedly have held that conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment."); *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001) ("It is well-settled that speculation may not be used to manufacture a genuine issue of fact.").  CTA asks the court to strike large portions of Ms. Parker's statement of additional facts because they are immaterial, lack foundation, contain hearsay, contain conclusory or speculative assertions, or improperly cite to the record.  (*See generally* Def.'s Resp. to Pl.'s SOAF [131]; *see also* Def.'s Reply at 3–4.)  Rather than discuss these dozens of arguments here, the court will address arguments surrounding each fact only as it becomes necessary below.

### B.    Summary Judgment

A moving party will succeed on its motion for summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court must "examine the record in the light most favorable to the non-movant, granting [that party] the benefit of all reasonable inferences that may be drawn from the evidence . . . ."  *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (internal quotations omitted).  A party moving for summary judgment bears the burden of either "(1) showing that there is an absence of evidence supporting an essential element of the non-

moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016). If the moving party meets this burden, then the non-moving party "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). While "the burden on the non-movant is not onerous," the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to show a genuine issue of material fact." *Burton v. Kohn L. Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (quoting *Liu v. T & H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999)).

Here, CTA argues that Ms. Parker has failed to establish a genuine dispute of material fact for each of the following claims: (1) disparate treatment under the ADA, 42 U.S.C. § 12112(b)(1); (2) creation of a hostile work environment; (3) failure to provide reasonable accommodations, *id.* § 12112(b)(5)(A); and (4) FMLA retaliation, 29 U.S.C. § 2601 *et seq.*[2] The court will address each claim in turn.

### 1.    Disparate Treatment

A plaintiff alleging disparate treatment in violation of the ADA must show that "1) [s]he is disabled; 2) [s]he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; 3) [s]he suffered an adverse employment action; and 4) the adverse action was caused by [her] disability." *Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020). To establish the fourth element, "[i]t is essential for the plaintiff to link the adverse action with [her] disability." *Id.* Thus, "a plaintiff must show a genuine issue of material fact exists regarding whether [her] disability was the 'but for' reason for the adverse action." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017). A non-moving party can meet this standard either by providing evidence of explicitly discriminatory statements (so-called "direct" evidence)

---

[2]    Ms. Parker initially also alleged FMLA interference (Third Am. Compl. ¶¶ 90–95), but she affirmatively waived that claim in her opposition brief. (Pl.'s Opp'n [124] at 13.)

or by providing circumstantial evidence to support an inference of discrimination (so-called "indirect" evidence). *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683–86 (7th Cir. 2014). Both direct and indirect evidence can be evaluated so long as they are equal contributors to an analysis of the overarching legal standard: "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [disability] caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016) (holding courts can consider both direct and indirect evidence so long as they are not "sorted into different piles, labeled 'direct' and 'indirect,' . . . [and] evaluated differently").

Ms. Parker has not offered any argument in support of her disparate treatment claim. To begin, Ms. Parker discussed only one "adverse employment action" in her opposition brief: CTA's failure to use her in the supervisor pool. (Pl.'s Opp'n at 13–14.) But Ms. Parker attributed this action not to disability discrimination, but rather to retaliation in response to her use of FMLA benefits. (*Id.*) And even if the court decided to repurpose this adverse action in support of a disparate treatment argument, Ms. Parker would still fail on the element of causation. The opposition brief points to no direct or indirect evidence supporting an inference that Ms. Parker's disability caused CTA's failure to use her in the supervisor pool.[3] Indeed, Ms. Parker's opposition brief fails to mention the phrase "disparate treatment" a single time. (*See generally* Pl.'s Opp'n.)

In the summary judgment context, "[t]he non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment." *Nichols v.*

---

[3]     Ms. Parker does argue that CTA employees who are injured on duty ("IOD employees") are treated more favorably than CTA employees who are disabled but not occupationally injured. (Pl.'s Opp'n at 2.) This statement does not obviously support a claim that "similarly situated employees *without a disability* were treated more favorably." *Bunn*, 753 F.3d at 685 (emphasis added). The law does require employers to extend the same light-duty benefits to both IOD employees and employees who are disabled for reasons unrelated to their employment. *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017). To the extent Ms. Parker seeks to pursue a claim of discrimination under this theory (that CTA unlawfully offered superior benefits to IOD employees), the court concludes the single statement she offers in a summary paragraph is insufficient to preserve the issue. (Pl.'s Opp'n at 2.)

*Mich. City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014). This is true even where a party presents an argument but simply fails to properly develop it. *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) ("[An] undeveloped argument constitutes waiver."); *see also Parise v. Integrated Shipping Sols., Inc.*, 292 F. Supp. 3d 801, 807 n.6 (N.D. Ill. 2017) (same). The Seventh Circuit has "repeatedly and consistently held that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) (internal quotations omitted). CTA asserts that Ms. Parker waived her argument for disparate treatment in her opposition brief by failing to develop her disparate treatment claim. (Def.'s Reply at 7.) The court agrees. The disparate treatment claim is waived.

### 2.     Hostile Work Environment

Next, CTA seeks summary judgment on Ms. Parker's claim that CTA created a hostile work environment. The Seventh Circuit recently affirmed that "hostile work environment claims are cognizable under the ADA." *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 851 (7th Cir. 2019). In order to survive summary judgment, "plaintiffs must present evidence that: '(1) they were subject to unwelcome harassment; (2) the harassment was based on their [disability]; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability.'" *Id.* at 856 (quoting *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018)). Ms. Parker's hostile-work-environment claim fails on the third element. Based on the evidence presented, no reasonable jury could find that the harassment she experienced was severe or pervasive.

The law "does not prohibit all verbal or physical harassment in the workplace." *Silk v. City of Chicago*, 194 F.3d 788, 804 (7th Cir. 1999) (internal quotations omitted). Rather, "the plaintiff must demonstrate that the workplace was both subjectively and objectively hostile." *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005). More specifically, the law requires a plaintiff to provide

evidence of "either a tangible employment action, such as discharge or demotion, or a non-tangible action, such as discriminatory conduct that is so severe or pervasive as to create an 'abusive' working environment." *Id.* Whether conduct is sufficiently severe or pervasive depends on "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 714 (7th Cir. 2017) (internal quotations omitted). "Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840–41 (7th Cir. 2009).[4]

The Seventh Circuit's ruling in *Mannie* is instructive. There, a plaintiff with paranoid schizophrenia claimed hostile work environment where "her supervisors made derogatory statements about her, discussed her mental condition with other employees, and . . . her co-workers discussed rumors about her mental stability . . . ." *Mannie*, 394 F.3d at 982–83. The Seventh Circuit dismissed the plaintiff's claim in large part because "[m]ost of the conduct that forms the basis of her claim consists of derogatory statements made by supervisors or co-workers out of her hearing." *Id.* at 983. Even the incidents that occurred within the plaintiff's presence were "isolated and not particularly severe." *Id.* Furthermore, the plaintiff had "submitted no evidence that could establish that she experienced a tangible employment action or that she was unable to perform her job because of the conduct of her supervisors and co-workers." *Id.*

Ms. Parker's attempt to show "severe or pervasive" harassment fails for similar reasons. This is true even if the court assumes all of the evidence she offers on this issue is admissible. As in *Mannie*, Ms. Parker's hostile work environment claim relies almost entirely on derogatory

---

[4]      While *Milligan-Grimstad* and *Scruggs* both deal with Title VII rather than the ADA, "the Seventh Circuit has 'assumed that the standards for proving . . . [hostile work environment under the ADA] would mirror those . . . established for claims of hostile work environment under Title VII." *Mashni v. Bd. of Educ. of City of Chicago*, No. 15 C 10951, 2017 WL 3838039, at *10 (N.D. Ill. Sept. 1, 2017) (quoting *Mannie*, 394 F.3d at 982).

statements made by supervisors or co-workers outside of her presence. It is undisputed that Ms. Parker "never heard anyone call her 'crazy' to her face and is unable to identify who made comments calling her crazy or a liar." (Pl.'s Resp. to Def.'s 56.1 ¶ 64; Parker Dep. at 73:19–21.) Similarly, Ms. Parker stated in her deposition that when managers made comments "[t]hey would never say it directly to my face. They would tell other people . . . [who] would tell me." (Parker Dep. at 142:17–18.) And to the extent that offensive conduct occurred within Ms. Parker's presence, those instances were isolated and fell below the requisite level of severity. As far as the court can tell,[5] Ms. Parker provided evidence of just a few isolated instances in which it is clear that coworkers made offensive comments to her face: one in which Ms. Parker's manager James Lachowicz accused her of "falsifying [her] illness" (Parker Decl. ¶ 25), one in which a fellow bus operator said that Ms. Parker's daughter was "going to hell" because she had killed herself and therefore "can't go to heaven," and one in which a coworker said "your daughter is technically dead, so you don't have a daughter, do you." (Parker Dep. at 140:13–141:2.)

There is no doubt that such comments are not merely disrespectful but cruel. Still, when claiming hostile work environment, "the threshold for plaintiffs is high . . . . " *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005). Indeed, even when it might appear unjust, the Seventh Circuit has repeatedly rejected hostile work environment claims involving isolated incidents of highly offensive conduct directed at the plaintiff. *See, e.g.*, *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 401 (7th Cir. 2010) (granting summary judgment despite isolated comments from a supervisor that plaintiff "could not do what others could do because he was black" and that "she was not sure what her neighbors would think if she invited a black person to

---

[5]    The plaintiff's opposition brief was largely unhelpful in identifying statements made directly to Ms. Parker. Ms. Parker's brief identified the following four such statements: (1) that her deceased daughter was a "figment of her imagination," (2) that "nothing is wrong with you," (3) that Ms. Parker "should be over it by now," and (4) that Ms. Parker was accused of "falsifying her illness" when returning from medical leave. (Pl.'s Opp'n at 13.) Unfortunately, the brief provides no citations for any of these statements, and the court was able to locate evidence supporting only the fourth statement.

her home"); *see also Whittaker*, 424 F.3d at 646 (collecting cases in which isolated incidents of severe sexual harassment did not amount to hostile work environment).

Isolated instances are not sufficient to establish a hostile work environment. *Scruggs*, 587 F.3d at 840–41. Ms. Parker did not argue that the incidents in this case involved any threats of physical harm. Nor did she provide any proof that they materially interfered with her work performance. *See Milligan-Grimstad*, 877 F.3d at 714 (granting summary judgment even where offensive conduct was pervasive because the conduct "was not physically threatening, nor did it interfere with [plaintiff]'s work performance"). In fact, despite this harassment, Ms. Parker earned a promotion to "Bus Services Supervisor" just months after the relevant time period. (Pl.'s Resp. to Def.'s 56.1 ¶ 4; Parker Dep. at 16:19–24.) Accordingly, Ms. Parker has failed to provide evidence to establish that she experienced "severe or pervasive harassment." The court grants CTA's motion for summary judgment on Ms. Parker's hostile work environment claim.

### 3. Failure to accommodate

CTA also moves for summary judgment on Ms. Parker's failure to accommodate claim. Under the ADA, an employer unlawfully discriminates against an individual with a disability if the employer fails to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . ." *Bunn*, 753 F.3d at 682 (quoting 42 U.S.C. § 121112(b)). To establish a claim for failure to accommodate, a plaintiff must show "(1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 747–48 (7th Cir. 2011) (internal quotations omitted). First, the employee must make the employer aware that she is a qualified individual with a disability seeking a reasonable accommodation. *Id.* From there, "the ADA obligates the employer to engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005) (quoting *Gile v. United Airlines, Inc.,* 213 F.3d 365, 373 (7th Cir. 2000)).

The parties' briefs focus almost exclusively on the "interactive process" issue. In cases involving a disability related to mental health, a plaintiff "must make their employer[ ] aware of any nonobvious, medically necessary accommodations with corroborating evidence such as a doctor's note . . . ." *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009). Once made aware of the need for accommodation, "an employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance." *Sears*, 417 F.3d at 804. Rather, the employer has an "affirmative obligation to seek the employee out and work with her to craft a reasonable accommodation." *Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 638 (7th Cir. 2020) (quoting *Sears*, 417 F.3d at 807). Moving forward, "the employer and the employee must work together through an 'interactive process' to determine the extent of the disability and what accommodations are appropriate and available." *Sears*, 417 F.3d at 804. Each party must set forth a "'good faith effort' to determine what accommodations are necessary." *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786 (7th Cir. 2016) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)). If the process breaks down, "courts should attempt to isolate the cause . . . and then assign responsibility." *Id.*

The parties dispute which side is responsible for a breakdown in the interactive process in this case. It is undisputed that on July 28, 2015, Ms. Parker provided Deshone Maddox with medical documentation which stated that—due to her pregnancy and PTSD—Ms. Parker could neither drive a bus nor work more than eight hours per day. (Def.'s 56.1 ¶¶ 61–62.) This was adequate to put CTA on notice and begin the interactive process. *See Ekstrand*, 583 F.3d at 976 (holding an employee can put their employer on notice by providing a doctor's note or orally relaying a statement from a doctor). At that point, it was CTA's responsibility to seek out Ms. Parker and work with her to craft a reasonable accommodation. CTA did no such thing. Instead, when Ms. Parker asked to be assigned to a non-bus-driving job for a short period, Maddox said no—the only way Ms. Parker could return would be "if [she] came back to full duty with no

19

restrictions."[6]  (Parker Decl. ¶ 17; Parker Dep. Additional Pages at 153:5–14; 154:16–21.)  Such outright rejections of accommodations requests are unlawful under the interactive process regime.  *See, e.g.*, *Sears*, 417 F.3d at 808 (holding for employee where employer "denied her requests, and then . . . disengaged from the process"); *see also Basden v. Pro. Transp., Inc.*, 714 F.3d 1034, 1038–39 (7th Cir. 2013) (holding for employee where "[r]ather than engage in an interactive process, [the employer] denied the request for leave and terminated her").

CTA nevertheless argues that the breakdown in the interactive process occurred not when Maddox said "no" to Ms. Parker's request, but rather when Ms. Parker submitted new medical documentation a week later—effectively withdrawing her accommodation request, in CTA's view. (Def.'s Mem. in Supp. of Summ. J. [117] (hereinafter "Def.'s Mem."), at 13–14.)  In support of this proposition, CTA cites a case with similar facts (and similar parties), *Pickett v. Chi. Transit Auth.*, No. 16 C 4337, 2018 WL 3456497 (N.D. Ill. July 18, 2018).  In *Pickett*, the court granted CTA's motion for summary judgment against a full-time bus operator who had requested a "light duty" assignment to accommodate his PTSD.  The court ruled against the plaintiff in part because he retracted his accommodation request before CTA's Accommodation Review Committee had the

---

[6]      CTA objects to this paragraph of the Parker Declaration, noting, first, that these facts do not cite to any supporting materials in the record.  As stated above, however, a self-serving declaration such as this *can* serve as freestanding record material.  *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (holding that although deposition testimony is inherently self-serving it can be "perfectly admissible evidence through which a party tries to present its side of the story at summary judgment").  And Ms. Parker also provided support for this testimony in her deposition, as well.  Second, CTA argues that this testimony contradicts Ms. Parker's admissions in paragraphs 55 and 58 of her response to CTA's statement of facts.  But the cited paragraphs state only that *Maddox's* contemporaneous calendar notes failed to mention an accommodation request and that Ms. Parker requested her accommodation over the telephone.  (Pl.'s Resp. to Def.'s 56.1 ¶¶ 55, 58.)  These paragraphs are hardly inconsistent with Ms. Parker's statement that Maddox said "no" to her accommodation request and told Ms. Parker that she could return only to full duty with no restrictions.  Moreover, a telephone request would be sufficient to put CTA on notice of Ms. Parker's need for accommodation.  *Ekstrand*, 583 F.3d at 976 (holding an employee can put the employer on notice orally).  Finally, CTA argues that this statement relies on hearsay evidence.  This too falls short.  Maddox's statements are admissible under Federal Rule of Evidence 801(d)(2)(D) as a statement offered against an opposing party, made by the party's employee on a matter within the scope of that relationship.  *See, e.g., Baines v. Walgreens Co.*, 863 F.3d 656, 663 (7th Cir. 2017) (holding a statement admissible under Rule 801(d)(2)(D)).  CTA's objection to Paragraph 17 of the Parker Declaration is overruled.

chance to consider it.  As the court explained, "CTA had no duty to *immediately* assign [plaintiff] to light duty."  By retracting his accommodation request before CTA had provided an answer, the plaintiff had "never, in fact, requested the accommodation at issue."  *Id.* at *12 (emphasis added).

*Pickett* is distinguishable.  Unlike the plaintiff in that case, Ms. Parker did not retract her reasonable accommodation request before receiving a response from CTA; she retracted it only after Maddox turned down her request and told her she had to return to full duty if she wanted to return at all.  It was only after this negative response that Ms. Parker went back to her doctor to obtain medical approval to return to work at full capacity.  (Def.'s 56.1 ¶¶ 61–63.)  And while CTA's policy might require all reasonable accommodation requests to eventually go through the ARC (*id.* ¶ 25; AP 1017 at 1, 5), CTA tells its employees that they can request an accommodation by contacting Deshone Maddox orally or in writing.  (Hampton Dep. at 34:2–35:7.)  Furthermore, "properly participating in the interactive process means that an employer cannot expect an employee to read its mind and know that" she must request a reasonable accommodation in a specific way.  *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996).  "The employer has to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help."  *Id.*

As CTA sees things, the consequences of Maddox's conduct were negligible, because just one week later, Ms. Parker presented a new statement from her doctor stating that she could return to work at full capacity, meaning that she was denied accommodation for just seven days.  (Def.'s 56.1 ¶ 63; Def.'s Reply at 8.)  The court is unpersuaded.  CTA directs employees to take accommodation requests to Maddox.  (Hampton Dep. at 33:18–34:10.)  Ms. Parker did so, and the evidence, viewed in the light most favorable to Plaintiff, supports her assertion that Maddox denied the request, without referring Ms. Parker to the ARC or suggesting any other avenue for an accommodation.  (Parker Decl. ¶ 17–18.)  Ms. Parker asserts in her declaration that she asked her doctor to change the medical authorization out of desperation: "[d]ue to being out of work" she "could not pay [her] mortgage . . . had to file bankruptcy . . . [and t]he reality was, if [she] did not

go back to work, [she] would be homeless."[7] (Parker Decl. ¶ 20.) Ultimately, Ms. Parker returned to her doctor and explained: "I'm in need of money, I need to do something, I'm just going to go back and drive the bus. I ha[ve] no other option." (Parker Dep. at 168:8–19.) In short, accepting her evidence as true, Ms. Parker abandoned her request for accommodation only after CTA had turned it down. The court concludes that CTA caused the breakdown of the interactive process.[8] As CTA failed to proffer any further arguments on the reasonable accommodation issue, the court denies CTA's motion for summary judgment as to Ms. Parker's failure to accommodate claim.

### 4. FMLA Retaliation

The FMLA prohibits employers "from retaliating against an employee that exercises or attempts to exercise FMLA rights." *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012) (citing 29 U.S.C. § 2615(a)(2)). "In other words, the employer cannot use an employee's use of FMLA leave as a negative factor in . . . employment decisions." *James v. Hyatt Regency Chi.*, 707 F.3d 775, 781 (7th Cir. 2013) (citing *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 978 (7th Cir. 2008)). A plaintiff alleging retaliation must prove "discriminatory or retaliatory intent." *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010) (quoting *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)). But she need not show "retaliation was the *only* reason" for the adverse

---

[7] CTA also objects to the admissibility of this fact, arguing that "Plaintiff never raised any of these issues during her deposition even though she was asked about her damages and what facts she must support [*sic*] her case." (Def.'s Resp. to Parker Decl. [131-1] ¶ 20.) In support of this objection, CTA cites to Dkt. No. 118-2, Ex. E, Pl. Dep. 229:14–234:20. As those pages do not appear in the record, the court cannot make assumptions about their contents. In any event, Ms. Parker's testimony is not inconsistent with her failure to respond to a question about damages. She testified in her declaration that she asked her doctor to change her medical documentation because she had to go back to work in order to pay her bills. This is distinct from claiming that not being paid while not working is part of her damages. For these reasons, the objection is overruled.

[8] Ms. Parker also argues that CTA's entire ARC regime is at odds with the ADA's interactive process requirements. (Pl.'s Opp'n at 11–12 (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685 (7th Cir. 1998).) Having found that the interactive process broke down before implicating the ARC, the court declines to address Ms. Parker's challenge to that process. Nor is there a need for the court to consider whether the existence of CTA's "light duty" program for IOD employees shows that providing such an accommodation for a non-IOD employee would not impose an undue hardship on CTA.

action; rather she must establish that "the protected conduct was a substantial or motivating factor in the employer's decision." *Id.* (quoting *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008)) (emphasis in original). Finally, a plaintiff must file her FMLA retaliation claim within the FMLA statute of limitations. *See Barrett v. Ill. Dep't of Corr.*, 803 F.3d 893, 898 (7th Cir. 2015) (affirming summary judgment for the employer where the employee failed to comply with FMLA's statute of limitations). CTA seeks summary judgment on Parker's FMLA retaliation claim because she has not established that she suffered an adverse action as a result of taking FMLA leave. The court agrees.

To establish a claim of FMLA retaliation, plaintiff must offer evidence that "(1) she engaged in activity protected by FMLA, (2) her employer took an adverse employment action against her, and (3) the two were causally connected." *Malin v. Hospira, Inc.*, 762 F.3d 552, 562 (7th Cir. 2014). To show causation under the third prong, the plaintiff may provide "either 'smoking gun' or circumstantial evidence of retaliatory intent." *Carter v. Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015). "Smoking gun evidence typically requires an admission of discriminatory intent." *Id.* (citing *Tank v. T–Mobile USA, Inc.*, 758 F.3d 800, 805 (7th Cir. 2014)). Alternatively, pieces of circumstantial evidence can be combined into "'a convincing mosaic" that permits an inference of discriminatory intent. *Pagel*, 695 F.3d at 631 (quoting *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008)). This convincing mosaic may include "suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination." *Id.* (citing *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 570 (7th Cir. 2012)).

Ms. Parker alleges retaliation in that she claims that she was used in the supervisor pool less often than her fellow employees who had not taken FMLA leave. (Pl.'s Opp'n at 13–14.) She supported this claim with testimony that her manager, Derek McFarland, told her "if you can't come to work and drive a bus you can't come to work and be in the supervisor pool." (Parker Decl. ¶ 30.) She also testified that managers looked directly at her and said "she is right there.

23

She know [*sic*]. She used FMLA. That's why."[9]  (Parker Dep. at 147:2–17.)  Finally, she testified that it is "almost common knowledge . . . that people that took FMLA leave would not be utilized in the supervisor pool."  (*Id.* at 109:12–16.)

Nonetheless, Ms. Parker's FMLA retaliation claim fails on other grounds.  There is no evidence of adverse employment action in this case.  "In the retaliation context, the challenged adverse action need not be one that affects the terms and conditions of employment, but it must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity."  *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016) (internal quotations omitted).  The only adverse action Ms. Parker points to in this case is CTA's alleged refusal to use her in the supervisory pool as frequently as her peers.  The evidence in support of this claim is too thin to survive summary judgment.  She claims that there were "many occasions where I could have been utilized in the supervisor pool but I was overlooked" for people with less seniority, but Ms. Parker has not identified any of those many occasions.  (Parker Decl. ¶ 31.)  And while Ms. Parker claimed that management retaliated by choosing less-senior employees for substitute supervisor assignments (*id.*), that claim fails because it is undisputed that CTA does not consider seniority when choosing a substitute supervisor from the pool.  (Jamison Dep. at 16:12–20, 62:20–23; Robertson Dep. at 22:17–23:13; Parker Dep. at 101:22–102:5.)  Ms. Parker's co-worker, Robertson testified that "[w]hen Yolanda came to work, she was used in the pool" as much "as others when they came to work."  (Robertson Dep. at 40:4–21.)  Nor is the court troubled by testimony that managers refused to assign persons who had taken leave to serve as substitute supervisors; an employee who is on leave would be unable to supervise other workers for obvious reasons.

---

[9]  CTA argues that these statements are hearsay evidence and thus irrelevant to the court's summary judgment analysis.  (Def.'s Resp. to Parker Decl. ¶ 30.)  Without more foundation (specifically, which manager made the statements?  when were they made? did these managers control substitute supervisor assignments?), the court is unable to conclude that these statements are admissible under Federal Rule of Evidence 801(d)(2)(D) or otherwise; because the FMLA claim fails for other reasons, the court need not address the issue further.

Significantly, there is no basis for a finding that the alleged retaliation materially affected Ms. Parker's promotional opportunities. *See Breneisen*, 512 F.3d at 979 (an employment decision that "resulted in fewer promotional opportunities . . . would qualify as an adverse employment action . . . ."). Ms. Parker herself stated that operators are typically in the supervisor pool for about five years before CTA promotes them to full-time supervisors (Parker Dep. at 138:6–17), yet CTA promoted Ms. Parker to a full-time supervisor position on September 26, 2016—about four years after she entered the supervisor pool. (Parker Dep. 16:21–24, 31:7–10.) That promotion occurred despite the fact that Ms. Parker was on FMLA leave for a year during that time frame.

As the court concludes Ms. Parker's FMLA retaliation claim fails on the merits, it need not reach the CTA's timeliness challenge to this claim.[10]

## **CONCLUSION**

For the foregoing reasons, the court denies Chicago Transit Authority's motion for Summary Judgment [114] with respect to Ms. Parker's ADA failure to accommodate claim but grants it on all other counts.

ENTER:

Dated: December 7, 2020

REBECCA R. PALLMEYER
United States District Judge

---

[10]    CTA also argues that Ms. Parker cannot bring a FMLA retaliation claim because she was not eligible for FMLA leave when she requested it on January 27, 2015. (Def.'s Mem. at 16; Def.'s 56.1 ¶ 43.); *Bliss v. Jennifer Convertibles, Inc.*, No. 01 C 8661, 2003 WL 22239655, at *17 (N.D. Ill. Sept. 29, 2003) ("[T]here is ample authority for the . . . proposition . . . that one cannot bring a claim for retaliation . . . if one is ineligible for FMLA leave.") It is undisputed, however, that Ms. Parker did take 472 hours of approved FMLA leave between January 8, 2014 and January 7, 2015. (Def.'s 56.1 ¶ 37.) Her claim is that CTA retaliated for her taking that leave.